UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| : | |
| v. : | Crim. No. 22-cr-257 (CJN) |
| : | |
| MILOMIR DESNICA, : | |
| : | |
| Defendant. : | |

## MEMORNDUM IN AID OF SENTENCING

The United States of America, by its undersigned counsel, hereby files its Memorandum in Aid of Sentencing in this matter. For the reasons set forth below and as may be further explained at the sentencing hearing, the government asks that the Court sentence the defendant to 204 months incarceration.

**I.    SENTENCING FACTORS**

In sentencing a defendant, after calculating the appropriate Guideline range, the Court must consider the factors set forth in 18 U.S.C. § 3553. *See Gall v. United States*, 552 U.S. 38 (2007). These factors are in keeping with the traditional factors used by courts when imposing a sentence: (1) the protection of society against wrongdoers; (2) the punishment or discipline of the wrongdoer; (3) the reformation of the wrongdoer; and (4) the deterrence of others from the commission of like offenses. *See Spanziano v. Florida*, 468 U.S. 447, 477-78 (1984) (Stevens, J., concurring); *see also Williams v. New York*, 337 U.S. 241, 251 (1949). Further, under the Guidelines and Section 3553, similarly situated defendants should receive like punishments. See 18 U.S.C. § 3553(a)(6).[1]

---

[1] The Government believes the Pre-Sentence Report (PSR) correctly states that the defendant's Guideline range is 210 to 262 months. The Government agrees that a six month departure is warranted under *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994).

1

## II.     FACTUAL BACKGROUND

### A. Monopoly Market

In late 2019, the FBI began investigating a darknet market known as Monopoly Market ("Monopoly").  Monopoly operated much like a conventional e-commerce website:  users could browse goods for sale from Monopoly's home page which was organized by category.  These categories included categories such as ecstasy, pharmaceuticals, and stimulants.




Monopoly Market Main Page as of 12/8/2021 @ 1.41.39 PM

Monopoly was set up as a "hidden service" or "onion service" on the "dark web" also known as the "darknet." The dark web is a part of the World Wide Web accessible only through anonymity-enhancing platforms such as the Tor network, a special network of computers on the Internet designed to conceal users' true IP addresses. Monopoly required that all transactions be conducted in cryptocurrencies, including Bitcoin and Monero.

To operate as a vendor on Monopoly, vendors first had to complete an application. This application was reviewed by the Monopoly operator using the vendor name "Monopoly" on the Monopoly Market and accompanying Monopoly Forum and the moniker "u/MonopolyOfficial" on the darknet forum Dread. The application requested a variety of information from potential vendors, including descriptions of the items they intended to list, markets the vendors had previously sold on, PGP Public Keys associated with their current and previous vendor identities,

3

and how vendors wished to pay their commissions to the Monopoly operator.[2] The Monopoly operator also had to confirm the inventory of the prospective vendor, that is, the vendor actually had the drugs it was requesting to sell.  Usually, this was done by the vendor taking photographs of its drug stock. The Monopoly operator would typically then make comments on these applications such as requesting additional clarifying information, advising that the prospective vendor had been accepted, or denying the application. Denials would typically provide a reason for the denial and instructions on how to improve their chance of being accepted. These vendor applications were posted publicly on Dread and later the Monopoly Forum.

---

[2] PGP or "Pretty Good Privacy" is software that allows for the encryption and decryption of text and files. GPG is an open-source implementation of PGP that is free. PGP/GPG encryption uses two "keys" referred to as the Public Key and the Private Key. A user's Public Key, as the name implies, is meant to be shared widely to allow people to encrypt messages to the user. The recipient then uses their private key to decrypt a message or file that was encrypted using their public key. In practice, this means that Private Keys are not widely shared to maintain their integrity and security, but that Public Keys must be made available to others to facilitate encrypted communication. As part of generating a Public Key and a Private Key, also referred to as a "Key Pair," users may, but are not required to, provide an e-mail address and/or name or moniker that may be incorporated into the header of the Public Key and subsequently visible when the public key is imported into PGP/GPG software.

A typical vendor listing for one of the vendors that the FBI purchased from—Self-Sabotage—and the methamphetamine received by the FBI are shown here:





Unlike most other darknet markets, Monopoly operated with a post-payment commission system. The vendor received the full proceeds of sales completed on the market. At regular time

5

intervals agreed upon in the vendor's application, the operator of Monopoly invoiced the vendor for the amount owed to the operator based on the sales completed during that timeframe at the agreed-upon rate. The Monopoly operators typically took 5% of a vendor's sales. In this fashion, Monopoly facilitated over $18 million in narcotics sales.

### B. Law Enforcement Action

During its investigation, the FBI confirmed on numerous occasions that Monopoly was used to commit crimes in the United States. Specifically, in 2021, undercover FBI employees in the District of Columbia as well as the Eastern District of Virginia purchased narcotics from the site and received it successfully in these locations. The controlled purchases totaled over 125 grams of methamphetamine.

On or about December 28, 2021, a server hosting Monopoly was seized by a foreign law enforcement partner. Pursuant to a Mutual Legal Assistance Treaty (MLAT) request, the FBI obtained a forensic image of this server which contained both the market database as well as the forum database.

Technical examination of the image revealed several data tables of interest. One data table was labeled "payments." This table listed details of the invoices sent to the vendors and the bitcoin or Monero address in which the vendor should transfer the funds to pay the operator of Monopoly for the monthly fee based on sales. The table also included invoice numbers, vendor IDs, amounts, whether the invoice was paid or not, and the date and time of the invoice. For invoices prior to October 22, 2021, the contents of the payment address field had been deleted, but the remaining information was intact.

The FBI subsequently analyzed numerous transactions to and from the addresses believed to be controlled by the operator of Monopoly. Based on a review of the transactions, it appeared

that each month, since at least April 2020, the operator of Monopoly would liquidate the funds it received in bitcoin from vendor payments by sending half of the proceeds to an address for storage, which remained unspent as of May 2022. The other half of the funds were sent to at least two cryptocurrency exchange services that did not collect user information.

### C. Identification of the Defendant

The FBI identified two bitcoin deposits from MoonPay.io (MoonPay) into the wallet that also received the July 2020 Monopoly proceeds. On April 6, 2022, MoonPay provided records indicating the bitcoin deposited into the wallet was purchased by Milomir Desnica through an account registered with a Google account. Additional details indicate Desnica purchased the bitcoin using credit cards ending in 8077 and 0719. The account registered to Desnica was linked to Desnica's gmail address of fakkura@gmail.com.

Records provided by Google on April 21, 2022, revealed the fakkura@gmail.com account was created on April 20, 2015, and registered to an individual named Fakku with a recovery email of 0x0ffd@gmail.com. A Google Pay account was also associated with the account having a billing name and address of Milomir Desnica, of Serbia. The Google Pay account listed a credit card ending in 0719, which is the last four digits of the credit card used to purchase bitcoin that was deposited directly into a wallet controlled by the operator of Monopoly. Desnica used a Serbian IP address to access the fakkura@gmail account within minutes of the Monopoly operator using the same IP address to exchange cryptocurrency. He also engaged in online forums and social media accounts where he displayed a knowledge of coding, computer systems, narcotics, cryptocurrency, and spoke in fluent English. Finally, a search warrant of the fakkura@gmail.com account revealed that it contained seed phrases needed to access some of the Monopoly operator's bitcoin wallets. (Seed phrases are twelve-word phrases that function as passwords for a bitcoin

wallet so it is very unlikely that someone with the seed phrases got them without being associated with Monopoly's operator.)

### III. Section 3553 Factors

As notes above, after calculating and consulting the appropriate Guideline range, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). The Government addresses the relevant factors below.

#### A. Nature and Circumstances of the Offense

The Government views the defendant's crimes as an extremely serious offense. The Court knows well the devastating effect drug distribution has on our community. The defendant used his considerable skill in helping to set up the Monopoly Market.[3] Vendors sold an incredible amount of narcotics through the Market. Indeed, the FBI determined that approximately 30 kilograms of methamphetamine was sold to individuals in the United States through the Market. Additionally, vendors on the Market sold approximately 20 kilos of cocaine and 6,700 opioid pills to individuals in the United States.

In addition, the fact that the defendant operated his drug business from behind computers and servers does not make his crime any less serious or dangerous. Indeed, by creating an easy avenue for first-time drug users and dealers and allowing for easy distribution of drugs through the mail, the Market posed a significant danger to our community and communities throughout the United States. *See generally Untied States v. Ulbricht*, 858 F.3d 71, 129 (2d Cir. 2017) (affirming life sentence for the creator of Silk Road marketplace). The defendant profited enormously from

---

[3] The probation office determined that the defendant did not qualify for the specialized skill enhancement because he reported no formal training with regard to computers. *See United States v. Lord*, 915 F.3d 1009, 1023 (5th Cir.2019). While the Government does not quarrel with that determination in this case, it is readily apparent that the defendant is an intelligent individual who used his considerable talents in setting up the Market.

the sale of narcotics through the Market. In the course of approximately two years, he received approximately $620,000 in cryptocurrency from sales of narcotics conducted through the Market.

### B. Deterrence and the Need to Protect the Public

The defendant is 34 years old. The Government believes a substantial sentence is necessary to deter him from committing similar crimes when he is eventually released. Furthermore, the defendant's case has been publicized on darknet forums and darknet news sites. A substantial sentence is necessary to deter others from similar conduct.

### C. History and Characteristics of the Defendant

In considering the defendant's history and characteristics, the Government must acknowledge that he accepted responsibility for his own actions early on in this case. He candidly admitted to his conduct, and by doing so he obviated the need for what would have been a lengthy, complicated trial. The Government also recognizes Mr. Desnica's tragic upbringing and his drug use as outlined in the PSR. The Government can only hope that he will take advantage of treatment programs available to him in the BOP.

### D. Need to Avoid Sentencing Disparities

A sentence within the Guidelines will generally avoid unwanted sentencing disparities among defendants who have committed similar crimes. Indeed, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023) (quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).

In addition, while there are relatively few internet drug distribution cases, in each of the cases the Government has found the defendants received substantial sentences from district courts. *See, e. g., United States v. Teixeira Spencer, et al*., 21cr145 (D.C.) (JDB) (darknet vendors of

narcotics sentenced to 150 months and 144 months); *United States v. Decker*, 832 Fed. Appx. 639 (11th Cir. 2020) (darknet vendor of narcotics sentenced to 140 months); *United States v. Schiffner*, 22cr217 (E.D.Va.) (TSE) (darknet vendor of narcotics sentenced to 150 months). Moreover, a French national who acted first as a vendor and then as an administrator and senior moderator on the Dream Market was sentenced to 240 months. *United States v. Vallerius*, 17cr20648 (S.D. Fla.) (RNS).

## IV. CONCLUSION

For the reasons stated herein, the Government requests that the Court impose a sentence of 204 months on Count One. The Government will move to dismiss Count Two at sentencing pursuant to the plea agreement.

Respectfully submitted,
MATTHEW GRAVES,
UNITED STATES ATTORNEY

By: /s/ Nihar Mohanty
Nihar R. Mohanty
D.C. Bar No. 436-686
Assistant United States Attorney
United States Attorney's Office for D.C.
Patrick Henry Building
601 D Street, N.W.,
Washington, D.C. 20530
E-mail: Nihar.Mohanty@usdoj.gov
Telephone: (202) 252-7700